# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Acme Standex,                              :
               Petitioner    :
                                      :
         v.                              :  No. 1397 C.D. 2017
                                      :  Submitted: March 9, 2018
Workers' Compensation Appeal            :
Board (Gomez and Roma                    :
Aluminum Co. Inc.),                       :
               Respondents   :

**BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE ELLEN CEISLER, Judge**

*OPINION NOT REPORTED*

**MEMORANDUM OPINION
BY JUDGE BROBSON**                    **FILED:  November 20, 2018**

Petitioner Acme Standex (Acme) petitions for review of an order of the Workers' Compensation Appeal Board (Board), which affirmed the decision of the Workers' Compensation Judge (WCJ).  The WCJ granted Freddie Gomez's (Gomez) claim petition and denied Acme's petition to join Roma Aluminum Company, Inc. (Roma) as an additional defendant.  For the reasons that follow, we affirm.

## I.  FACTUAL BACKGROUND

### A.  Employment

Gomez worked for Acme as a sheet metal machine operator.  Starting in 2010, Gomez began to experience pain in his right knee and both of his thumbs.  Gomez's pain gradually worsened, and, on October 5, 2012, Gomez told Acme's

owner that he could no longer work there. Within a month of leaving his employment with Acme, Gomez began working for Roma, a window company, where he worked until September 8, 2014, when Gomez underwent surgery on his right knee. On November 3, 2014, Gomez filed a claim petition under Pennsylvania's Workers' Compensation Act (Act)[1] against Acme, seeking workers' compensation benefits starting October 5, 2012.

The WCJ held hearings starting on January 15, 2015. Because the testimony bears on the ultimate outcome of this case, we begin by recounting the relevant testimony in some detail.

## B. Testimony Before the WCJ

### 1. Gomez

Gomez testified that he worked for Acme for 25 years. (Reproduced Record (R.R.) at 13a.) The position entailed about 55 hours a week of lifting heavy bundles of metal pipe and coils, weighing up to 70 pounds. (R.R. at 14a.) Pertinent to his workers' compensation claim, Gomez testified that his position also required him to climb onto and jump down from Acme's machinery. (R.R. at 14a, 17a.) The work for Acme caused him pain in both his knees, with the right knee being worse, and pain in his thumbs when his thumbs would "lock up." (R.R. at 16a.) In 2010, when he began to experience pain, he reported his injuries to his supervisors and asked to be moved to a seated position, but his supervisors rejected his request. (R.R. at 17a.) He also requested that Acme send him to Acme's workers' compensation clinic or to a doctor, but his supervisors responded by telling him to "wait a while and see" if he continued to have issues with his knees and thumbs. (R.R. at 17a-18a.)

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2708.

Gomez testified that the pain became bad enough that he decided to see a doctor on his own, rather than wait for Acme's assistance in seeking treatment. (R.R. at 17a-18a.) He received cortisone shots in his knees, which helped to alleviate some of the pain. (R.R. at 19a, 20a.) He later went to Acme's workers' compensation clinic and received cortisone shots in his thumbs. (R.R. at 20a.) He used all of his sick days and vacation days trying to recover. (R.R. at 20a.) The cortisone shots provided only temporary relief, and his symptoms returned after he returned to work. (R.R. at 20a-21a.) He continuously complained to his supervisors that he was experiencing pain and repeatedly requested a seated position. (R.R. at 21a.) His pain worsened after Acme downsized in 2011-2012, which resulted in an increased workload for him. (R.R. at 21a.) He decided to stop working for Acme on October 5, 2012, because the pain became too great to continue working there. (R.R. at 22a.)

Gomez testified that he started working for Roma, a window company, shortly after leaving Acme. (R.R. at 23a.) Initially, the workload at Roma was lighter than his workload with Acme. (R.R. at 23a-24a.) The work picked up after about a year, however, and Roma required him to lift heavier and heavier pieces of glass. (R.R. at 23a-24a.) As the work at Roma became more strenuous, his ailments slowed him down, and he needed frequent breaks. (R.R. at 24a.) He was only able to work at Roma for about a year and a half before he informed Roma's owner that he needed to stop working and undergo surgery.[2] (R.R. at 23a, 223a-24a.)

---

[2] At several points in Gomez's testimony, the attorneys in this case questioned Gomez about the pain he was experiencing when he left his position at Acme relative to the pain he was experiencing when he left his position at Roma. Gomez gave varying answers that fell into three categories: (1) the pain was the same when he left Acme as when he left Roma; (2) the pain was worse when he left Roma, as evinced by the fact that he needed surgery when he left Roma; and (3) the pain levels went up and down with such frequency that he could not pinpoint the times

Gomez testified that on September 8, 2014, Ira Sachs, M.D., performed surgery on his right knee. (R.R. at 25a.) The surgery did not improve his right knee pain. (R.R. at 26a-27a, 230a.) Following the surgery, he received physical therapy, and Dr. Sachs prescribed him pain relievers. (R.R. at 26a.) He did not receive treatment for his thumb pain and left knee pain. (R.R. at 26a.) He testified that after surgery, he began to experience low back pain and that, due to that pain and his continued knee pain, he is unable to sit or stand for long periods of time. (R.R. at 217a, 235a-36a.) Gomez further testified that Dr. Sachs did not release him to return to work. (R.R. at 26a.) Moreover, Gomez did not believe, based on his ailments, that he would ever be able to work in his former position for Roma. (R.R. at 26a-27a.) Gomez has not worked since 2014. (R.R. at 231a.)

Finally, pertinent to the instant appeal, Gomez testified that his knee injuries had a gradual onset and that there was no specific incident that he believed caused his injuries. (R.R. at 222a-23a.)

### 2. Dr. Lipton

Andrew Lipton, D.O., testified on behalf of Gomez. He began treating Gomez in the Spring of 2015. At that time, Gomez complained of bilateral knee pain that worsened with sitting, standing, and walking, and that interfered with his sleep. (R.R. at 58a.) Dr. Lipton diagnosed Gomez with "bilateral[] knee pain with status post-arthroscopy of the right knee and low back pain." (R.R. at 60a-61a.) Dr.

---

when the pain was worse. In their briefs, the attorneys both express frustration at the discrepancy or selectively quote the portions of Gomez's testimony that most benefit their arguments. We need not examine these discrepancies, however, because, as explained in the legal discussion below, in a workers' compensation case, the resolution of conflicts in evidence is left to the WCJ. *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 143-44 (Pa. Cmwlth. 2004).

4

Lipton testified that he reviewed an MRI of Gomez's right knee from July 8, 2010 (2010 MRI). (R.R. at 61a.) Regarding that 2010 MRI, Dr. Lipton testified: "[T]he biggest impression was tear of the body of the posterior horn of the medial meniscus, likely a complex flap tear. Possibly a ganglion versus a parameniscal cyst, bursitis, and small popliteal cyst."[3] (R.R. at 62a.)

Dr. Lipton testified that Dr. Sachs performed surgery on Gomez "to treat his medial meniscus tear and flap, and it was an arthroscopy and synovectomy and a partial meniscectomy from my recollection." (R.R. at 63a.) Dr. Lipton ordered an MRI to evaluate the knee for a "possible surgical reevaluation or re-intervention." (R.R. at 61a.) His testimony continued:

> Q. What was significant, if anything, about the second MRI?
>
> A. Well, the second MRI did pick up degenerative changes as its main impression, but then they [sic] also picked up an oblique tear of the posterior horn, which was on the first one, but they [sic] don't mention anything about the flap. So I assume from the changes that's the post-surgical changes that Dr. Sachs addressed, the piece that was flapping and giving him issues, but did not address the oblique tear which was still there on 6/11/2015.
>
> . . . .
>
> Q. In the repeat study, are there any new findings or interval changes?
>
> A. This may be better commented on by a radiologist, but the radiologist -- and there's two different radiologists initially -- related the tear as a tear of the body of the posterior horn. The body is the widest part of it, implying across the body, likely a complex flap tear, versus the repeat MRI says

---

[3] Matthew McLean, M.D., ordered the MRI in 2010. Dr. McLean did not testify in this case. The record does, however, contain the radiology report that pertains to the 2010 MRI. (*See* R.R. at 109a-10a.)

oblique tear, which is a different kind of across, and angle tear. So it's -- a possibility is that either an extension of the medial meniscus tear that was there before or a new tear.

Q. In your review of the surgical report, does it appear that Dr. Sachs visualized the findings and addressed them, or did he leave something, or can you make that opinion from your review of the surgical report?

A. From the surgical report and the differences in the five-year gap, that there's no more flap tear, I can assume that the surgical intervention by Dr. Sachs addressed at least part of the tear or the flap tear, and that's all I can assume from that.

Q. Can you say whether, if he had stopped working after he had worked for [Acme], he would have needed the surgery to address these findings from 2010 or not? Can you say --

A. There's no way for me to comment on this. Not having my physical exam back then and five years between these images, there's no way for me to comment on that.

(R.R. at 64a-65a, 80a-82a.)

Dr. Lipton testified that Gomez's injuries were work related:

Q. Doctor, can you explain for the Judge how his right knee issues are related to any work causation?

A. So, basically, we have somebody that presents with a[n] ongoing and repetitive stress issue over time, so there was no definitive, oh, I fell and I hurt it with one episode. He gives me the history an ongoing aggravation, like a degenerative change. So it's hard to pinpoint the exact mechanism of injury when it's repetitive and over a couple years' period. But that would be my description of his source of injury.

(R.R. at 66a-67a.) The testimony continued:

Q. What's your update and final diagnosis for him?

A. Bilateral knee pain and low back pain.

6

Q. Are those both related to the work injury?

A. I see the clear correlation of the knee pain, and I believe due to the surgical intervention and the rehab, the low back pain is a likely compensatory type of response to walking on one leg or having pain in the knee for a couple of years. So he didn't give any specific incident to when the back pain started, but he did report it after the surgery.

(R.R. at 67a-68a.)

Dr. Lipton testified that he believed Gomez aggravated his injuries while working at Roma. (R.R. at 90a.) In an attempt to discern the role that Gomez's employment at Roma had on his injuries, counsel for Roma elicited the following testimony from Dr. Lipton:

Q. Do you know whether he was doing any jumping or any flexing of his knees while at Roma?

A. He reported to me incidentally that the job prior to Roma he was up and down and jumping, but the Roma job was carrying, loading and unloading of glass units.

Q. What's the difference, if there's any, in those two mechanisms, being up and down, if someone had to jump up onto a table and then climb down from a table, versus just carrying? Is there a difference in impact on the knees?

A. There is. We typically see the jumping up and down causing more of an acute issue and a tear versus the up and down and carrying more of a degenerative issue and chronic.

Q. If you had to relate the findings shown on the 2010 MRI to an acute cause or carrying -- an acute cause like you were just talking about, jumping up and down and flexing versus carrying, what would you say it was more related to, if you can say that? I don't want you to --

A. Because of the flap and complex tear, I -- you know, my -- it would be a guess, but I would

7

say that's a -- more of an acute traumatic tear versus a degenerative change. That would be an opinion.

Q. Would that be more consistent with jumping up and down and getting up and down or carrying, if you can tell?

A. It would be more consistent with jumping, but it could be either mechanism.

(R.R. at 91a-93a.)

Dr. Lipton also testified regarding the report authored by Eugene A. Elia, M.D., who had conducted an independent medical examination of Gomez on behalf of Acme:

Q. After you reviewed that, did you agree or disagree with anything that [Dr. Elia] found?

A. . . . [O]n his exam, [Dr. Elia] calls it trace synovitis. [Gomez] has been up and down on his exam with different amounts of fluid. I called it a bursitis and a joint effusion, and this surgeon [(Dr. Elia)] did not.

. . . .

This surgeon says there was no indication that he sustained a right medial meniscal tear at work. And, again, the exact history of when he developed this was hard to pinpoint, as he did report it over a two-year period. So I don't see how he could say that definitely, just as I can't say definitively it happened at work, but it makes sense from his history and the presentation and the imaging that this was a degenerative change and an aggravation of a meniscal tear.

(R.R. at 69a-70a.)

### *3. Dr. Elia*

Dr. Elia testified and submitted an independent medical examination report on behalf of Acme. Dr. Elia testified that Gomez had "trace synovitis which is a very mild inflammation." (R.R. at 139a.) He testified that range of motion in

Gomez's right knee was 0 to 130 degrees, as compared to 0 to 135 degrees on the left. (R.R. at 139a.) Dr. Elia testified that Gomez had no effusion (water in his knee), no tenderness along the cartilage or meniscus, no tenderness of the back of the knee, no tenderness or crepitus (a cracking sensation) in the kneecap, no sign of an anterior cruciate ligament or meniscus tear, no fullness, and Gomez's knee strength was a "five out of five." (R.R. at 139a.) He testified that Gomez's left knee was "completely normal." (R.R. at 139a.)

Dr. Elia initially testified that he did not believe Gomez suffered a right medial meniscus tear while he was working at Acme (between 1987 and 2012). (R.R. at 145a-46a.) He then testified that the 2010 MRI showed "a tear of the medial meniscus" as well as "other small findings like a small ganglion cyst and some bursitis." (R.R. at 156a.) Dr. Elia also testified that Gomez underwent surgery on September 8, 2014 to repair the same tear shown in the 2010 MRI. (R.R. at 168a.) Thus, although Dr. Elia's testimony begins by positing that Gomez did not tear his meniscus at Acme, it ends by acknowledging that he tore his meniscus while at Acme, but it was not disabling until after he left his employment at Acme.

Part of Dr. Elia's testimony appears to reflect Acme's position as to why Gomez's 2010 MRI evinced a torn meniscus but he continued to work and did not undergo surgery until 2014:

> Q. Doctor, is the finding of a tear in and of itself a disabling event for patients?
>
> A. No, not at all.
>
> Q. Can you explain that to the Judge why it's not in and of itself a disabling event?
>
> A. Well, many of us have -- actually have tears of our cartilage or meniscus in the knees and we're basically asymptomatic. It's the symptomatic and disabling ones that need to be treated.

9

Q. And specifically, Doctor, based upon your review of the other medical records in this case and [Gomez's] testimony, was this finding, in and of itself a disabling event for [Gomez]?

A. No, it wasn't because there was no recommendations at the time that I know for surgery, and certainly he was able to continue working in a fairly vigorous job at Acme without having any restrictions or problems.

Q. And, specifically, given the date of this test that was performed in 2010, he continued to work based on your understanding for how long?

A. Two years.

Q. An [sic] then even following those two years, how long did he work at Roma until the surgery was performed?

A. Until almost another two years.

Q. Doctor, you touched upon this in your last answer, but is it possible for someone to have another tear of their [sic] medial meniscus and be asymptomatic?

A. Certainly.

Q. Do you ever see patients who have objective findings like a tear who are initially asymptomatic and then become symptomatic?

A. Yes.

Q. Have you ever had patients or have you ever reviewed any medical records regarding patients who demonstrate an objective findings [sic] like a meniscus tear and that surgery is not immediately recommended or needed?

A. Yes.

Q. And, specifically, in this case, Doctor, do you have an opinion as to whether a change in [Gomez's] condition took place at a given time that would then warrant surgery?

A. There doesn't appear to be an incident that would have created that need.

10

Q. But eventually [Gomez] did undergo surgery in 2014?

A. He did.

Q. Are you able to testify within a reasonable degree of medical certainty as to a specific event that would have caused that need for surgery?

A. No.

Q. Is it possible that [Gomez's] work duties at the window and glass company, the second job, would have caused the need to have a surgery?

A. Not specifically. There would have been an incident that would have created an almost disabling event and he would have had severe pain and not been able to continue working.

Q. Is it possible that his increase in symptoms were caused by his job while working at the glass company?

A. It's possible.

Q. Is it possible that [Gomez's] increase in pain was due to a completely unrelated work event outside of any job that he would have been performing?

A. Yes.

(R.R. at 156a-59a.)

Summarizing this testimony, Dr. Elia's position appears to be that Gomez's meniscus tear was not disabling prior to his departure from employment with Acme; the disabling event could have occurred while Gomez was employed at Roma, or it could have occurred from activities outside of work. (*See* R.R. at 171a ("Just getting out of bed can tear your meniscus or putting in a light bulb up on a ladder or cleaning leaves out of a gutter . . . .").)

Dr. Elia concluded that Gomez strained both his knees. (R.R. at 145a.) He testified that Gomez had fully recovered from those knee strains and did not require any additional medical treatment. (R.R. at 146a-47a.) He further testified

11

that Gomez could return to work without any restrictions and that he was able to work in a role such as the position he held at Acme. (R.R. at 146a.)

On cross-examination, Dr. Elia acknowledged that he did not know how many hours Gomez worked at Acme, if he worked weekends, or how many times per day at Acme Gomez was required to climb onto and jump down from machinery. (R.R. at 163a-64a.)

### 4. Dr. Nolan

Roma called John P. Nolan, M.D., who also conducted an independent medical examination of Gomez. Dr. Nolan testified that the 2010 MRI showed that Gomez had a medial meniscus tear in his right knee. (R.R. at 303a.) He testified that he could not determine what caused the meniscus tear in 2010 or if there was any work injury. (R.R. at 304a-05a.) He testified that the findings in the 2010 MRI justified surgery and Gomez may have needed surgery then. (R.R. at 316a, 332a.) There was no evidence that Gomez aggravated his injury while working at Roma, as the surgery addressed the same tear that was shown in the 2010 MRI. (R.R. at 333a.) Dr. Nolan testified that, based on what Gomez reported, Gomez's tear was symptomatic in 2010 when he had the MRI because a doctor would not have ordered an MRI if Gomez was not symptomatic. (R.R. at 313a.) Finally, Dr. Nolan testified that while Gomez may have some arthritis and might benefit from some additional medical treatment, there was nothing that he noticed during his examination of Gomez that would preclude Gomez from returning to work. (R.R. at 331a-32a.)

### 5. Jacob Gulli

Roma's owner, Jacob Gulli (Gulli), testified regarding Gomez's employment at Roma. Gulli testified that before he hired Gomez, he made it clear that the job required Gomez to be on his feet all day. (R.R. at 263a.) He emphasized

12

that the job entailed lifting: "It did involve lifting, yes. And that's one thing we stated when we hire anybody, that they have to be physically able to do anything." (R.R. at 285a-86a.) Gomez did inform him that he left his old job because he was injured there, but Gomez stressed that his injuries would not affect his ability to perform the duties of the position at Roma. (R.R. at 263a.) Gulli acknowledged that Gomez's personnel file did reflect that Gomez had bad knees. (R.R. at 264a.) The notation about Gomez's knees appeared to be in the handwriting of Gulli's daughter, who worked at Roma at the time. (R.R. at 264a.) While Gomez did inform him that he was injured at his last job, Gulli did not know the injuries related to Gomez's knees. (R.R. at 291a.)

Gulli testified that Gomez's position entailed cutting glass, washing glass, assembling window units, finishing window units, and moving glass from one area to another. (R.R. at 261a-62a.) Gomez did not appear to have any issues performing his job duties. (R.R. at 265a.) Gomez never approached him to report an injury or made any other indication that his job at Roma worsened his injuries. (R.R. at 273a.) He interacted with Gomez on a daily basis and he would have approached Gomez if he noticed any limping or other indication of an injury. (R.R. at 271a-72a, 283a.)

Gulli testified that he first learned of Gomez's knee issues when Gomez informed him about the surgery. (R.R. at 274a.) Gomez informed Gulli that his doctor told him that he had to have knee surgery and that "if he didn't have surgery, he would have collapsed, [and] that would have been the end of his knees." (R.R. at 284a.) Gomez initially told Gulli that he would miss 4 to 6 weeks of work. (R.R. at 276a.) After 7 to 8 weeks of missed work, Gulli called Gomez to ask about the prolonged absence. (R.R. at 276a.) Gomez informed Gulli that he was still

13

experiencing a lot of pain, so much so that he could not attend physical therapy. (R.R. at 277a.) After another doctor's appointment, Gomez informed Gulli that he would miss at least 6 more weeks of work so that he could attend physical therapy. (R.R. at 278a.) Counsel for Acme questioned Gulli about the prospect of Gomez filing a Workers' Compensation claim against Roma:

> Q. So at no point did you suggest he go through Workers' Compensation, correct?
>
> A. No sir, because I was never told that it was an injury that occurred at [Roma].
>
> . . . .
>
> Q. Do you think he might have been afraid to file a Workers' Compensation claim for fear that he would lose his job?
>
> A. No, sir, because I never indicate -- the first thing I tell an employee when he comes in, the day you step in here, you're [covered] under Workman's [sic] Comp.

(R.R. at 289a-90a.)

### C. WCJ Decision

On June 16, 2016, the WCJ issued a decision and order, granting Gomez's claim petition against Acme and denying the joinder petition against Roma. The WCJ determined that Gomez met his burden of proving that he sustained a work-related injury of his right knee, but that he did not meet his burden regarding the remaining injuries of the claim petition—*i.e.*, his hand injuries and the low back injury. The WCJ based his decision primarily on the following findings of fact:

> 12. This Judge finds the testimony of [Gomez] credible that he sustained a work[-]related injury to his knees while working for Acme as the result of jumping off and on machines and that he could no longer continue working for Acme because of the pain in his knees. In so finding, this Judge notes that [Gomez's] job duties were not contradicted. Acme

14

also did not contradict that [Gomez] had reported his knee pain and asked for lighter duty work. [Gomez] stopped working at Acme and the same month obtained a job at Roma which he thought was going to be lighter. The job was lighter at first and then became heavier which caused his knees to become more symptomatic. [Gomez] was never pain free after he stopped working for Roma.

13. This Judge finds the testimony of Dr. Lipton credible that *on October 5, 2012 [Gomez] sustained a right knee medial meniscal tear which resulted in surgery on September 8, 2014 and a left knee strain as the result of his repetitive and stressful job duties at Acme* and that he has not recovered from the right knee injury. This Judge finds that [Gomez's] surgery and his job duties at Roma were a recurrence of the original injury at Acme. In so finding, this Judge notes that [Gomez] had worked for Acme for 25 years and Dr. Lipton credibly testified that [Gomez's] knee condition was the result of his longstanding and repetitive job duties. While *Dr. Lipton's testimony was equivocal regarding the exact mechanism of the tear*, he did note that it was *more* consistent with an acute trauma as the resulting [sic] of the jumping [Gomez] did at Acme. *Dr. Lipton did unequivocally testify that [Gomez's] repetitive and physically stressful job duties aggravated the right knee such that he had to stop working on October 5, 2012*. Where the testimony of Dr. Lipton conflicts with the testimony of Drs. Elia and Nolan pertaining to the right knee, this Judge accepts the testimony of Dr. Lipton and rejects the testimony of Drs. Elia and Nolan.

14. This Judge does not find Dr. Elia's testimony credible that [Gomez] only sustained a right knee strain and sprain while working at Acme from which he had recovered. In so finding, this Judge notes that the 2010 MRI of the right knee showed a tear of the body of the posterior horn of the medial meniscus. In addition, Dr. Elia admitted that he did not know how many hours a week [Gomez] worked for Acme or how often [Gomez] had to jump off and

15

on the machines. Dr. Elia also agreed that an asymptomatic degenerative condition can become symptomatic as the result of repetitive trauma. Dr. Elia did not see any records that indicated that [Gomez] reported knee pain from any activities outside of work. This Judge finds the testimony of Dr. Elia credible that [Gomez] sustained a left knee strain but not credible that he had fully recovered from the injuries to his knees. Dr. Elia's opinion of full recovery is rejected as this Judge accepts the testimony of [Gomez] and Dr. Lipton on this issue.

15. This Judge does not find the testimony of Dr. Nolan credible that [Gomez's] meniscal tear and surgery were not caused or aggravated by his employment at Acme. In so finding, this Judge notes that Dr. Nolan could not render an unequivocal opinion as to the cause of the meniscal tear in 2010. However, Dr. Nolan did agree that [Gomez's] job duties at Acme could have caused or aggravated the knee pain [Gomez] was experiencing in 2010. Dr. Nolan further agreed that the findings in the 2010 MRI would have justified surgery at that time.

16. This Judge notes that Dr. Lipton did not offer any testimony that he treated [Gomez's] hands and did not render an opinion on causation. This Judge further notes that Dr. Lipton did not offer unequivocal testimony that [Gomez] sustained a work[-]related low back injury. Dr. Lipton testified it was harder to correlate a low back injury to the work injury because [Gomez] did not relate low back pain while working. Dr. Lipton's testimony on this issue was equivocal.

17. This Judge finds the testimony of [Gulli] credible that [Gomez] did not complain to him that his job duties caused him to have knee problems and that he did not observe [Gomez] perform his job with any difficulty. [Gulli] was aware [Gomez] went out of work for knee surgery but was not aware there was an allegation that his knee was worsened by his job duties at Roma until the Joinder Petition was filed.

16

18. This Judge finds that [Gomez] sustained a work[-]related injury on October 5, 2012 while working for Acme in the nature of a right knee medial meniscal tear which resulted in surgery on September 8, 2014 and a left knee strain as the result of his repetitive and stressful job duties. [Gomez] sustained a recurrence of said injury while working for Roma which resulted in surgery and disability as of September 8, 2014. In so finding, this Judge notes that [Gomez] had worked for Acme for 25 years and had to stop working in October 2012 because of knee pain. He began working for Roma later that month in a lighter position. The job at Roma became heavier and [Gomez] sustained a recurrence of his symptoms. This Judge finds it significant that the 2010 MRI of the right knee showed a tear of the body of the posterior horn of the medial meniscus.

(R.R. at 363a-65a (emphasis added).)

### D. Board Decision

On September 8, 2017, the Board issued an opinion and order, affirming the decision of the WCJ. The Board determined that the WCJ did not err in granting Gomez's claim petition because the record evidence demonstrated that he sustained an injury during the course and scope of his employment with Acme. The Board also determined that the WCJ correctly denied Acme's joinder petition. The Board reasoned that Gomez had surgery in 2014 to treat the same injury that Gomez had while he worked at Acme and, thus, Gomez suffered a recurrence rather than an aggravation of that injury. Next, the Board determined that Gomez's claim petition was timely under Section 315 of the Act, 77 P.S. § 602. Citing *Williamette Industries v. Workmen's Compensation Appeal Board (Lockett)*, 647 A.2d 665 (Pa. Cmwlth. 1994), the Board reasoned that in cases of cumulative trauma, where there is no specific injury-causing event, courts look to the last day of employment as the date of injury. As such, the Board reasoned that the date of injury for Gomez's

17

claim was October 5, 2012, and he therefore met the 3-year statute of limitations. Finally, the Board determined that the WCJ did not disregard any evidence and issued a well-reasoned decision.

## E. Issues on Appeal

On appeal,[4] Acme presents five arguments for our consideration. First, Acme contends that several of the WCJ's findings of fact are not supported by substantial evidence. Second, Acme argues that Dr. Lipton's testimony was equivocal. Third, Acme argues that the WCJ's decision was not well-reasoned in that it did not address the distinction between a recurrence and an aggravation and additionally failed to explain the WCJ's findings. Fourth, Acme argues that Gomez's claim petition was untimely because he was injured in 2010 but did not file his claim petition until 2014. Finally, Acme argues that substantial evidence supported the denial of the claim petition and the granting of the joinder petition.

In response, Gomez argues that the WCJ's decision was supported by substantial evidence and was reasoned and that Gomez's claim petition was timely. As to Dr. Lipton's testimony, Gomez argues that the testimony, taken as a whole, was not equivocal in that Dr. Lipton opined that Gomez's injuries were consistent with the repetitive jumping up and down movements associated with his job at Acme. As to the timeliness of the claim petition, Gomez argues that his claim

---

[4] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704. The Supreme Court has emphasized that "in construing the Act we are mindful that the Act was intended to benefit the injured employee, and, therefore, must be construed liberally in the employee's favor in order to effectuate its humanitarian objectives." *Gentex Corp. v. Workers' Comp. Appeal Bd. (Morack)*, 23 A.3d 528, 534 (Pa. 2011) (citing 1 Pa. C.S. § 1928(c)). "As such, borderline interpretations are to be decided in favor of the claimant." *Id.*

petition was timely because, when an injury is cumulative, the injury date for purposes of the statute of limitations is the last day worked rather than the date of diagnosis. Thus, the statute of limitations did not begin to run in 2010 as a result of the 2010 MRI, it began to run on October 5, 2012, when Gomez stopped working for Acme. Finally, as to the WCJ's denial of Roma's joinder petition, Gomez argues that he suffered a recurrence of the original injury at Roma rather than an aggravation, because his work at Roma did not materially contribute to his disability. The WCJ, therefore, correctly denied the joinder petition seeking to join Roma.

Roma also filed a brief. Roma first agrees with Acme that the WCJ's decision granting the claim petition was not based on substantial, competent, and unequivocal medical evidence. Roma also sides with Acme that Gomez's claim petition is untimely under the statute of limitations. Roma argues, alternatively and now diverging from Acme's position, that if this Court does affirm Gomez's claim petition, then the WCJ correctly determined that the re-emergence of Gomez's knee pain was a recurrence rather than an aggravation.

## II. DISCUSSION

### A. Substantial Evidence

At the outset, we note that it is well settled that the WCJ is the sole arbiter of credibility and evidentiary weight. *Womack v. Workers' Comp. Appeal Bd. (Sch. Dist. of Phila.)*, 83 A.3d 1139, 1154 (Pa. Cmwlth.), *appeal denied*, 94 A.3d 1011 (Pa. 2014). In determining whether the WCJ's findings are supported by substantial evidence, we may not reweigh the evidence or the credibility of the witnesses but must simply determine whether the WCJ's findings have the requisite measure of support in the record as a whole. *Elk Mountain Ski Resort, Inc. v. Workers' Comp. Appeal Bd. (Tietz, deceased)*, 114 A.3d 27, 32 n.5

19

(Pa. Cmwlth. 2015). It is irrelevant whether there is evidence to support a contrary finding; if substantial evidence supports the WCJ's necessary findings, we may not disturb those findings on appeal. *Williams*, 862 A.2d at 143-44.

It is also well settled that with respect to a claim petition, the claimant bears the burden of proving all elements necessary for an award. *Inglis House v. Workmen's Comp. Appeal Bd. (Reedy)*, 634 A.2d 592, 595 (Pa. 1993). Pursuant to Section 301(c)(1) of the Act,[5] an employee's injuries are compensable if they "(1) arise[] in the course of employment and (2) [are] causally related thereto." *ICT Group v. Workers' Comp. Appeal Bd. (Churchray-Woytunick)*, 995 A.2d 927, 930 (Pa. Cmwlth. 2010). Further, an employee must demonstrate that he is disabled as a consequence of the work-related injury. *Cromie v. Workmen's Comp. Appeal Bd. (Anchor Hocking Corp.)*, 600 A.2d 677, 679 (Pa. Cmwlth. 1991). Unequivocal medical evidence is required where it is not obvious that an injury is causally related to the work incident. *Id.* "The question of whether expert medical testimony is unequivocal, and, thus, competent evidence to support factual determinations is a question of law subject to our review." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012). "In such cases, we review the testimony as a whole and may not base our analysis on a few words taken out of context." *Id.* "Taking a medical expert's testimony as a whole, it will be found to be equivocal if it is based only upon possibilities, is vague, and leaves doubt." *Kurtz v. Workers' Comp. Appeal Bd. (Waynesburg College)*, 794 A.2d 443, 449 (Pa. Cmwlth. 2002). "[M]edical testimony is unequivocal if a medical expert testifies, after providing a foundation for the testimony, that, in his

---

[5] 77 P.S. § 411(1).

professional opinion, he believes or thinks a fact exists." *O'Neill v. Workers' Comp. Appeal Bd. (News Corp. Ltd.)*, 29 A.3d 50, 57 (Pa. Cmwlth. 2011).

Here, Acme challenges the WCJ's credibility determination set forth in Finding of Fact 12. Acme contends that "the WCJ erred by finding [Gomez] credible that he sustained a work-related injury to his knees while working for Acme, and stopped working for Acme [due to] the pain in his knees[,]" because such finding is not supported by the record. (Acme's Br. at 11.) Stated more simply, it appears that Acme takes issue with the WCJ's reliance on Gomez's testimony to establish causation. Given, however, that Gomez was required to establish causation through unequivocal medical evidence because the cause of his injuries was not obvious, Gomez's testimony relative to causation is irrelevant to the WCJ's decision. *See Cromie*, 600 A.2d at 679. In addition, when we read Finding of Fact 12 in its entirety, it appears that the WCJ intended Finding of Fact 12 not to establish causation but rather as a mechanism to credit Gomez's testimony relative to the description of his job duties at Acme and the fact that he stopped working for Acme due to the pain in his knees, because without such testimony there would be no factual basis to support Dr. Lipton's opinion that Gomez's knee injuries were causally related to his job at Acme. The WCJ's findings in that regard are supported by the record as Gomez testified: (1) his position at Acme required him to climb onto and jump down from machinery; (2) his position at Acme caused him to experience pain in both his knees; and (3) he stopped working for Acme on October 5, 2012 because of the pain in his knees. (*See* R.R. at 14a, 16a-17a, 22a.)

Acme also challenges the WCJ's credibility determination set forth in Finding of Fact 13. Acme contends that the WCJ erred by finding Dr. Lipton's testimony credible to establish that Gomez sustained a repetitive injury to his knees

on October 5, 2012, while working for Acme, because the WCJ determined that Dr. Lipton's testimony was equivocal regarding the mechanism of Gomez's injury. In so doing, Acme focuses its arguments on the WCJ's inconsistent findings with respect to the cause of the medial meniscus tear. In other words, Acme questions how the WCJ could find that Dr. Lipton's testimony established that Gomez sustained a right knee medial meniscus tear on October 5, 2012, but also find that Dr. Lipton's testimony was equivocal regarding the exact mechanism of the medial meniscus tear. While we agree that there are inconsistencies in the WCJ's findings with respect to the underlying cause of the medial meniscus tear and that such findings may not be supported by substantial evidence, a finding regarding the cause of the medial meniscus tear was not necessary to the WCJ's determination in this matter. The operative question is not when the medial meniscus tear itself occurred, but, rather, when the medial meniscus tear became disabling. In that regard, the WCJ found that Dr. Lipton unequivocally testified that Gomez's "repetitive and physically stressful job duties [at Acme] aggravated the right knee such that he had to stop working on October 5, 2012." (R.R. at 364a.) This finding is supported by the record.

Dr. Lipton's testimony, taken as a whole, establishes that Gomez suffered an aggravation of his right knee medial meniscus tear and bilateral knee pain while working for Acme on October 5, 2012. Dr. Lipton related Gomez's knee injuries to the repetitive stress that Gomez endured while working for Acme—*i.e.*, the climbing onto and jumping down from machinery. While Dr. Lipton admitted that it is "hard to pinpoint the exact mechanism of injury when [it is] repetitive and over a couple years' period[,]" the law does not require him to do so. As explained more fully below, in a repetitive trauma/aggravation case, every aggravation is a new

22

injury and the last date the aggravation occurs constitutes the date of the injury. *See Armco, Inc. v. Workmen's Comp. Appeal Bd. (Mattern)*, 667 A.2d 710, 717 (Pa. 1995). In other words, Dr. Lipton recognized that Gomez suffered a new aggravation of his right knee medial meniscus tear each day that he was required to climb onto and jump down from machinery at Acme. Dr. Lipton's testimony relating Gomez's knee injuries to his work at Acme, coupled with Gomez's testimony that he stopped working for Acme on October 5, 2012, due to the pain in his knees, establishes the necessary causal connection between Gomez's knee injuries and his work at Acme. For these reasons, we cannot conclude that the WCJ's decision was not supported by substantial evidence.

## B. Aggravation versus Recurrence

In Pennsylvania workers' compensation law, where a case presents a fact pattern in which there is an injury and subsequent worsening of the injury, Pennsylvania courts distinguish between a "recurrence" and an "aggravation" of the initial injury. A recurrence occurs where a disability results directly from a prior injury that re-emerges from an intervening incident that *does not* contribute materially to the disability. *SKF USA, Inc. v. Workers' Comp. Appeal Bd. (Smalls)*, 728 A.2d 385, 387 (Pa. Cmwlth.), *appeal denied*, 747 A.2d 903 (Pa. 1999). An aggravation, or new injury, occurs where the intervening incident *does* materially contribute to the renewed disability.[6] *Id.* Whether or not the intervening incident

---

[6] This Court clarified in *SKF USA* that aggravation versus recurrence cases are not meant to suggest that the intervening incident in no way contributes to the disability:

> In most situations where this sort of dispute arises, both the original injury and the subsequent occurrence contribute in some way to the disability at issue. Nonetheless, in order to adjudicate the rights of the parties, we frequently must attribute causation of the current disability to one event or the other.

23

materially contributed to the disability is a question of fact to be determined by the WCJ. *S. Abington Twp. v. Workers' Comp. Appeal Bd. (Becker & ITT Specialty Risk Servs.)*, 831 A.2d 175, 181 (Pa. Cmwlth. 2003).

In the instant matter, this distinction between Gomez suffering an aggravation or a recurrence bears on the nub of the case—the operative question: Who pays, Acme or Roma? When a workers' compensation claimant has sustained a recurrence of a prior injury, the employer at the time of the initial injury will be held liable for all disability benefits resulting from the re-emergence of the injury. *Pope & Talbot v. Workers' Comp. Appeal Bd. (Pawlowski)*, 949 A.2d 361, 369 (Pa. Cmwlth. 2008). If, on the other hand, the claimant suffers an aggravation, the current employer is responsible for all medical and wage loss benefits arising from the new injury. *Id.* Here, the WCJ held Acme liable because the WCJ determined that Gomez suffered a mere recurrence of his disabling knee injuries. That is, the WCJ determined Gomez's work at Roma did not materially contribute to his disabling injuries. Had the WCJ determined that Gomez suffered an aggravation at Roma, then Roma, rather than Acme, would be liable.

Acme's argument that Gomez suffered an aggravation, rather than a recurrence, fails first because, as stated above, that determination is a factual one, made by the WCJ. *S. Abington Twp.*, 831 A.2d at 181. We do not disturb a WCJ's factual determinations on appeal, provided they are supported by substantial evidence. In support of its argument, Acme argues that the WCJ could not have determined that Gomez suffered an aggravation while working at Acme but only suffered a recurrence at Roma, but offers no authority in support thereof. To the

*SKF USA*, 728 A.2d at 387. Thus, whether to assign liability to the second employer, the focus of the Court's analysis is to determine if the second employment materially contributed to the disability. *Id.*

24

extent Acme argues that the WCJ's recurrence determination is not supported by substantial evidence, the credited testimony in this case defeats that argument. Gomez worked for Acme for 25 years, while he worked for Roma for less than 2 years. As explained more fully above, Dr. Lipton opined that Gomez's job duties at Acme, climbing onto and jumping down from machinery, caused his knee injuries. Gomez was able to perform at Roma because, at least initially, his job duties were less physically demanding than his job duties at Acme. Just because the WCJ could have reached a contrary finding is *nihil ad rem*, beside the point. *Verizon Pa., Inc. v. Workers' Comp. Appeal Bd. (Mills)*, 116 A.3d 1157, 1162 (Pa. Cmwlth. 2015); *see also Sharon Steel Corp. v. Workers' Comp. Appeal Bd. (Frantz)*, 790 A.2d 1084, 1088 n.6 (Pa. Cmwlth. 2002) ("Even though there may be evidence which might indicate a contrary conclusion, the decision of the WCJ must be affirmed if substantial evidence is presented to support the WCJ's finding."). Here, the testimony and evidence presented to the WCJ entailed "relevant evidence as a reasonable mind might accept as adequate to support" the finding that Gomez suffered a recurrence of his knee injuries while at Roma. *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014). The Board did not err by affirming on this ground.

## C. Statute of Limitations

Acme next argues that Gomez's claim petition was untimely and that the WCJ and the Board erred in determining that October 5, 2012, was the date of injury. Section 315 of the Act, 77 P.S. § 602, provides a 3-year statute of repose for

filing a workers' compensation claim petition.[7] The "'[f]ailure to file a claim within the statutorily prescribed period extinguishes the right, as well as the remedy, under the . . . Act.'" *Armco*, 667 A.2d at 715 (quoting *Berwick Indus. v. Workmen's Comp. Appeal Bd. (Spaid)*, 643 A.2d 1066, 1067 (Pa. 1994)).

Citing to cases such as *Armco*, Acme and Roma emphasize that the statute of repose begins to run on the date of injury, rather than the date of disability. Acme and Roma further argue that where an employee has lost no time from work, the date of injury is the date of diagnosis under *Brooks v. Workmen's Compensation Appeal Board (Anchor Glass Container)*, 624 A.2d 821 (Pa. Cmwlth.), *appeal denied*, 637 A.2d 291 (Pa. 1993), and *Piad Corporation v. Workers' Compensation Appeal Board (Moskyok)*, 761 A.2d 640 (Pa. Cmwlth. 2000), *appeal denied*, 771 A.2d 1292 (Pa. 2001). Thus, Acme and Roma argue that the statute of repose should have begun to run in 2010 after the 2010 MRI revealed a tear in Gomez's medial meniscus. Roma also argues (separately from Acme) that if this Court determines that Gomez's claim petition was timely, then the WCJ correctly found that Acme was the responsible employer.

In response to the arguments by the employers, Gomez argues that the WCJ correctly determined that his date of injury was October 5, 2012. Gomez argues that this matter is more analogous to *USAir, Inc. v. Workmen's Compensation*

---

[7] Section 315 of the Act provides, in pertinent part:

In cases of personal injury all claims for compensation shall be forever barred, unless, within three years after the injury, the parties shall have agreed upon the compensation payable under this [Article III]; or unless *within three years after the injury*, one of the parties shall have filed a petition as provided in [Article IV] hereof.

(Emphasis added.)

*Appeal Board (Schwarz)*, 634 A.2d 714 (Pa. Cmwlth. 1993).[8]  Under *USAir*, Gomez argues, the date of injury in this case should be the final day of employment at Acme because he suffered aggravations of his meniscus tear until the time he left.

In *Brooks*, a machinist at a glass container manufacturer developed carpal tunnel syndrome for which he received a diagnosis in May 1985.  The machinist continued to work until 1988 when he underwent surgery.  The machinist filed a claim petition in June 1989.  Finding he filed his claim more than 3 years after the date of his injury, the referee (predecessor to the WCJ) dismissed his petition as untimely, and the Board affirmed.  On appeal to this Court, we affirmed as well.  We reasoned that the machinist was aware of his injury in 1985 but failed to file until nearly four years later.  We also distinguished precedent from this Court by noting that the machinist was aware of the work-relatedness of his injury when he received his diagnosis and, in contrast to hearing loss cases, in *Brooks* there was no "special difficulty as far as isolating a single moment in time when the injury has occurred." *Brooks*, 624 A.2d at 824.

Months after we decided *Brooks*, we decided *USAir*.  In *USAir*, a flight attendant during the 1970s and 1980s developed pain in her feet as a result of USAir requiring her to wear high heels and be on her feet for long periods of time.  In October 1989, the flight attendant underwent surgery on her feet and informed USAir that her injuries were work related.  In March 1990, the flight attendant filed a claim petition.  The flight attendant's surgeon opined that her injuries were "certainly aggravated" after the initial onset of foot pain by continuing to work long

---

[8] Gomez also cites to *Curran v. Workmen's Compensation Appeal Board (Maxwell Industries)*, 664 A.2d 667 (Pa. Cmwlth. 1995), *appeal denied*, 673 A.2d 337 (Pa. 1996), and *Roberts v. Workers' Compensation Appeal Board (Double R Enterprises)*, 719 A.2d 847 (Pa. Cmwlth. 1998), but does not develop an argument regarding those cases.

hours in high heels. *USAir*, 634 A.2d at 715 (emphasis omitted). The referee dismissed her claim as untimely under Section 311 of the Act[9] (providing a 120-day period for providing notice to the employer of an injury); the referee reasoned that she had known about her injuries for 10 years but failed to notify USAir.

On appeal to this Court, we vacated and remanded so that the referee could make a finding of fact addressing the credibility of the flight attendant's surgeon's opinion that the flight attendant aggravated her injuries. If the flight attendant suffered daily aggravations, the date of injury would be her last day worked, but we were precluded in our analysis due to the lack of a factual finding regarding that testimony.[10] Notably, in *USAir*, we distinguished *Brooks*. We explained that *Brooks* was distinguishable because, unlike the flight attendant in *USAir*, the machinist in *Brooks* "presented no medical evidence to the effect that by performing daily work duties, [the machinist] suffered a new injury each day on the job." *USAir*, 634 A.2d at 718 n.7.

In *Piad*, the employer's two successive insurance carriers disputed which would be held liable to a tool and die maker diagnosed with carpal tunnel syndrome, epicondylitis, and tendonitis. The first carrier was the carrier when the tool and die maker first became symptomatic for his injuries but before he received a medical diagnosis or incurred any medical expenses. The second carrier was the

---

[9] 77 P.S. § 631.

[10] Judge McGinley concurred in *USAir*, and wrote separately to recount extensively the not-always-clear nature of the caselaw in this area. *USAir*, 634 A.2d at 719-25 (McGinley, J., concurring). He concluded, "I believe we must establish a uniform approach to these types of cases and that claimants suffering work-related injuries similar to the one here should receive benefits." *Id.* at 725. Concerning notice under Section 311 of the Act, Judge McGinley wrote: "Although employers certainly have an interest in learning of such matters at the earliest possible date[,] the penalty of dismissing otherwise meritorious claims because the claimant continues to work with pain after a diagnosis is very unfair and not within the spirit of the Act." *Id.*

28

carrier when the tool and die maker received the diagnosis and subsequent medical expenses. We determined that the date of diagnosis, the latter of the two potential injury dates, was the operative date in *Piad*.

We agree with Gomez that the 3-year statute of repose began to run on the last day that he aggravated his meniscus tear—October 5, 2012. While *USAir* addressed the date of injury as it applied to timeliness under Section 311 of the Act (relating to notice to an employer), both the Supreme Court and this Court have applied the same logic to timeliness under Section 315 of the Act. *Armco*, 667 A.2d at 717; *Williamette Indus.*, 647 A.2d at 668. Aggravations are treated as new injuries. "Accordingly, the last day the aggravation occurs, which will most often be the last day of work, is the date from which the [3-]year limitation should be calculated." *Armco*, 667 A.2d at 717. Here, the WCJ determined that Gomez suffered continuous aggravations of his meniscus tear until he left his employment with Acme. That determination is supported by the credited testimony of Gomez and Dr. Lipton. Thus, Gomez's last day at Acme was his "date of injury" for purposes of Section 315 of the Act. The Board did not err, therefore, by determining that Gomez's claim petition was timely.[11]

### D. Reasoned Decision

Section 422(a) of the Act, 77 P.S. § 834, requires that a WCJ issue a reasoned decision, providing, in pertinent part:

> All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and

---

[11] The cases cited by the employers, *Brooks* and *Piad*, are inapplicable. As we noted in *USAir*, *Brooks* did not involve medical evidence of aggravations of the machinist's injury. *See USAir*, 634 A.2d at 718 n.7. *Piad* appears to be useful to the limited situations where a court must address which of an employer's successive insurance carriers was responsible for benefits. Neither aid in our analysis of determining the date of injury where there is medical evidence of regular aggravations following a diagnosis.

29

conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached. The workers' compensation judge shall specify the evidence upon which the workers' compensation judge relies and state the reasons for accepting it in conformity with this section. When faced with conflicting evidence, the workers' compensation judge must adequately explain the reasons for rejecting or discrediting competent evidence. Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the workers' compensation judge must identify that evidence and explain adequately the reasons for its rejection. The adjudication shall provide the basis for meaningful appellate review.

To be "reasoned," a WCJ must issue a decision that permits an appellate court to exercise adequate appellate review without further elucidation. *Ace Wire Spring and Form Co. v. Workers' Comp. Appeal Bd. (Walshesky)*, 93 A.3d 923, 934 (Pa. Cmwlth.), *appeal denied*, 104 A.3d 6 (Pa. 2014). In order to satisfy this standard, however, a WCJ does not need to discuss every detail of the evidence in the record. *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 194 n.4 (Pa. Cmwlth. 2006), *appeal denied*, 916 A.2d 635 (Pa. 2007). Rather, Section 422(a) of the Act requires a WCJ to issue a reasoned decision so that this Court does not have to "imagine" the reasons why a WCJ made a particular credibility determination or how the WCJ reached a particular conclusion. *Id.* at 196.

Here, only Acme argues that the WCJ's decision is not reasoned. Though Acme couches this argument in terms of how reasoned the decision was under Section 422(a) of the Act, Acme appears to argue that Findings of Fact 14, 15, and 18 are not supported by substantial evidence, as opposed to arguing that the decision lacks adequate explanation. In Finding of Fact 14, the WCJ rejected

30

portions of Dr. Elia's testimony and found such testimony to be not credible. In Finding of Fact 15, the WCJ rejected portions of Dr. Nolan's testimony and found such testimony to be not credible. The WCJ adequately explained the basis for these credibility determinations. In Finding of Fact 18, the WCJ summarized the factual determinations relative to the injuries sustained by Gomez. By arguing that the WCJ's credibility determinations with respect to Dr. Elia's and Dr. Nolan's testimony and overall factual determinations are not supported by substantial evidence, Acme is essentially asking this Court to reweigh the evidence and make alternative credibility determinations, which we will not do. *See Elk Mountain Ski Resort, Inc.*, 114 A.3d at 32 n.5. As explained more fully above, the WCJ's determination that Gomez sustained a work-related injury while working for Acme on October 5, 2012, is supported by the record—*i.e.*, Dr. Lipton's and Gomez's testimony.

### E. Joinder Petition

Acme's final argument is that substantial evidence supported a denial of the claim petition or, at the very least, a grant of the joinder petition. Aside from rearguing prior sections of its brief, Acme's argument seems to be that if Gomez sustained daily aggravations at Acme, he sustained at least one future aggravation at Roma. We reiterate that it is irrelevant whether there is evidence to support a contrary finding; if substantial evidence supports the WCJ's factual findings, we do not disturb those findings on appeal. *Williams*, 862 A.2d at 143-44. The WCJ determined that Gomez's date of injury was his final day of work at Acme and, as detailed above, that finding is supported by substantial evidence. The fact that the WCJ could have made different findings is immaterial. We conclude, therefore, that the WCJ did not err in denying the joinder petition.

31

### III. CONCLUSION

Like many of our workers' compensation cases involving repetitive damage to a body part over a span of years, this case reflects the difficulty in addressing the statutory requirements of the Act and the assignment of liability where there are multiple employers. Nevertheless, Acme has failed to provide any basis for which we should disagree with the adjudications by the WCJ and Board below. Accordingly, we affirm the Board's order.

_____
P. KEVIN BROBSON, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Acme Standex,                               :
                          Petitioner        :
                                            :
            v.                              :    No. 1397 C.D. 2017
                                            :
Workers' Compensation Appeal                :
Board (Gomez and Roma                       :
Aluminum Co. Inc.),                         :
                          Respondents       :

# **O R D E R**

AND NOW, this 20th day of November, 2018, the order of the Workers' Compensation Appeal Board is AFFIRMED.

_____
P. KEVIN BROBSON, Judge